ACCEPTED
06-15-00018-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
2/6/2015 8:41:47 AM
DEBBIE AUTREY
CLERK

## NO. 06-15-00018-CR

# IN THE COURT OF APPEALS FOR THE SIXTH DISTRICT OF TEXAS IN TEXARKANA

6th COURT OF APPEALS
TEXARKANA, TEXAS
2/6/2015 8:41:47 AM
DEBBIE AUTREY
Clerk

# IN RE STATE OF TEXAS EX REL. COUNTY AND DISTRICT ATTORNEY OF LAMAR COUNTY, TEXAS, Relator
# V.
# THE HONORABLE ERIC CLIFFORD, JUDGE OF THE 6TH JUDICIAL DISTRICT COURT OF LAMAR COUNTY, Respondent

## Original Proceeding Arising from the 6th District Court, Lamar County, Texas
## Cause No. 25545

# RESPONSE TO PETITION FOR WRIT OF MANDAMUS

Respectfully submitted,

THE MOORE LAW FIRM, L.L.P.
James R. Rodgers
State License #17136300
Judy Hodgkiss
State License #17136525
100 North Main Street
Paris, Texas 75460-4222
Telephone 903/784-4393
Facsimile 903/783-0042

ATTORNEY FOR REAL PARTIES IN INTEREST

i

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex.R.App.P. 52.3(a), the identity of parties, along with the names and addresses of all counsel, is as follows:

Relator
The State of Texas
Lamar County & District Attorney's Office
Lamar County Courthouse
119 North Main Street
Paris, Texas 75460

Attorney for the State of Texas
(appearing before Respondent)
Jill Drake and Laurie Pollard
Lamar County & District Attorney's Office
Lamar County Courthouse
119 North Main Street
Paris, Texas 75460

Attorney for Relator
Gary D. Young
Lamar County & District Attorney's Office
Lamar County Courthouse
119 North Main Street
Paris, Texas 75460

Attorney for Relator
Jeffrey W. Shell, *Attorney Pro Tem*
Attorney & Counselor at Law
2085 Berkdale Lane
Rockwall, Texas 75087

Real Party in Interest
Erica Lynn Fuller
% The Moore Law Firm, L.L.P.
100 North Main Street
Paris, Texas 75460

Attorney for Real Party in Interest
James R. Rodgers
The Moore Law Firm, L.L.P.
100 North Main Street
Paris, Texas 75460

Respondent

Honorable Eric Clifford
6th Judicial District Court of Lamar County, Texas
Lamar County Courthouse
119 North Main Street
Paris, Texas 75460

# TABLE OF CONTENTS

Identity of Parties and Counsel .................................................................. ii

Index of Authorities ................................................................................. v

Statement of Facts ................................................................................... 1

Arguments and Authorities ...................................................................... 3

Prayer..... ................................................................................................. 8

Certificate of Service ............................................................................... 9

Appendix .................................................................................................. 10

# INDEX OF AUTHORITIES

**CASES**                                                                  **PAGE**

*In re Bernson,* 254 S.W.3d 594 (Tex.App. - Amarillo 2008)................... 3

*In re Braswell,* 310 S.W.3d 165 (Tex.App. - Amarillo 2010) ................ 4

*In re Graves,* 217 S.W.3d 744 (Tex.App. - Waco 2007)......................... 3

*In re Tex. Dept. of Family and Protective Services,*............................... 4
   210 S.W.3d 609 (Tex. 2006)

*State v. Bounhiza,* 294 S.W.3d 780 (Tex.App. - Austin 2009)................. 7

*State v. Evans,* 843 S.W.2d 576 (Tex.Crim.App. 1992)........................... 6

*State v. McClelland,* 2006 WL 2692875 (Tex.App. - Eastland)................ 5,6

*State v. Savage,* 933 S.W.2d 497 (Tex.Crim.App. 1996)......................... 4,5,7, 8

**STATUTES**

3 Tex.Prac.Guide Crim.Prac. & Procedures § 29.62..................................... 8

# STATEMENT OF FACTS

On January 29, 2015, the trial of Erica Lynn Fuller commenced. Ms. Fuller was charged with theft over $1,500.00 but less than $20,000.00.

The testimony was that in 2001 Ms. Fuller had worked in the accounts payable department of Brentwood Terrace (nursing home). Ms. Fuller was accused of theft from one of the residents, Thomas Hughes.

To support the theft, the State called Caryon Miller, who was the auditor for Brentwood. Ms. Miller testified that the disputed money went from Brentwood's trust account to Brentwood's operating account. Ms. Miller admitted that Brentwood had the money and that Erica Fuller did not receive any of the money. (Appendix A, page 5).

Specifically, Ms. Miller testified as follows:

Q.    Who got the money?

A.    The facility.

Q.    Brentwood. You got the money, right?

A.    The facility, yes, sir.

Q.    So I have been saying for a day and a half. There's no money going into her pocket. It went from one account to the other account and Brentwood is the one that has the money, right?

1

A.	It was deposited into Brentwood's operating account.

(Appendix A, pages 5-6).

Further testimony from Ms. Miller established that the funds were in Brentwood's account.

Q.	...but you said a while ago Diversicare [Brentwood's corporate name] got the money, right?

A.	It went into the operating account.

Q.	Of Diversicare?

A.	Yes.

Q.	Did ya'll give it back to Mr. Hughes?

A.	Yes sir.

Q.	...took it out of his account and put it in their account, right?  Put it in Diversicare's account?

A.	Correct.

Q.	Not Erica Fuller's account.  So even if she was a horrible bookkeeper and made mistakes here the end result is Diversicare got the money, right?

A.	Yes it was paid to Diversicare through the trust fund.

(Appendix A, pages 7-8).

2

The undisputed testimony is that the money was in Brentwood's operating account instead of its trust account. Other testimony established that Erica Fuller had no check writing authority on the operating account as that was handled by another employee. Erica Fuller never received any of the money and, in fact, the money was transferred back to the trust account. Based upon the testimony, the defense made a Motion for Instructed Verdict at the conclusion of the State's case. The judge denied this motion and the case was submitted to the jury. After the jury verdict, the defense counsel re-urged the motion citing case authority. Thereafter, the judge granted the defense motion.

## ARGUMENTS AND AUTHORITIES

### A. Standard of Review

In a criminal proceeding, mandamus is available only if the relator can demonstrate: (1) that he has no other adequate remedy at law, and (2) that under the relevant law and facts, the respondent clearly abused his or her discretion, or the act sought to be compelled is purely ministerial. *In re Graves,* 217 S.W.3d 744 (Tex.App. - Waco 2007). A writ of mandamus is not a substitute for an appeal. *In re Bernson,* 254 S.W.3d 594 (Tex.App. - Amarillo 2008). In other words, a court of appeals may not issue a writ of mandamus if the record fails to demonstrate the lack

of an adequate remedy on appeal. *In re Tex. Dept. of Family and Protective Services,* 210 S.W.3d 609 (Tex. 2006). Further, sufficiency of the evidence is not reviewable by mandamus. *In re Braswell,* 310 S.W.3d 165 (Tex.App. - Amarillo 2010).

## B. Application to the Facts and Circumstances

1. The Relator Does Not Have a Right to the Relief Sought as Relator has the Right to Appeal.

As the basis for its claim of entitlement to mandamus, the State cites *State v. Savage,* 933 S.W.2d 497 (Tex.Crim.App. 1996). However, the *Savage* reasoning demonstrates that the Court, by its ruling, functionally granted a motion for new trial on the grounds of the insufficiency of the evidence on which the court had the power to do.

In *Savage,* a jury convicted the defendant of driving while intoxicated. At the trial court's request, the defendant moved for judgment non obstante veredicto which was granted. The State appealed. Ultimately, the petition for discretionary review was heard by the Court of Criminal Appeals.

The Court of Criminal Appeals found that trial judges do not have the authority to grant judgments non obstante veredicto. However, the Court then reasoned as follows:

4

Nevertheless, trial courts do maintain the authority to grant new trials for evidentiary insufficiency in criminal cases; a power which is the functional equivalent of granting a NOV in a civil case. Therefore, when a jury returns a guilty verdict and the trial court grants the defendant's motion for new trial based upon insufficiency of the evidence under Texas Rule of Appellate Procedure 30(b)(9), double jeopardy prevents the trial court from entering any other judgment than acquittal... Therefore, a trial court's NOV ruling after a jury determination of criminal guilt accomplishes exactly the same effect as granting the defendant a new trial for insufficient evidence - a functional acquittal.

The Court of Appeals went on to hold:

"...we have held that when an order is the functional equivalent of granting a motion for new trial, the reviewing court can look past the label assigned to the order by the trial court and treat the order as a motion for new trial. Article 44.01(a)(3) of the Texas Code of Criminal Procedure expressly allows the State to appeal any trial court's grant of a new trial...Under our holding in *Evans*, therefore, the State has the right to appeal the trial court's JNOV ruling as the functional equivalent of an order granting a new trial for insufficient evidence."

The Court of Criminal Appeals further reasoned that the trial court's J.N.O.V. ruling in *Savage* constituted a post-verdict ruling as a matter of law. Therefore, appellate review of a trial court's post-verdict J.N.O.V. ruling represents a constitutionally permissible evaluation of the legal sufficiency of the evidence and not a prohibited successive prosecution for the same offense.

The Court of Criminal Appeals held that after the appellate court reviews the evidence for its sufficiency, it has the power to render judgment.

A case applying the principles of *Savage* is *State v. McClelland*, 2006 WL

5

2692875 (Tex.App. - Eastland). At the conclusion of the State's case, the defendant moved for an instructed verdict, which the court denied. The jury then convicted the defendant of driving while intoxicated and the court sentenced him. Thereafter, the court advised counsel for both parties that it was uncomfortable with the verdict and only declined the motion for directed verdict because he believed the jury would acquit. The defendant moved for judgment J.N.O.V. which was granted and the State appealed.

While finding that the court did not have authority to enter a judgment other than the verdict rendered by the jury, the appellate court found that the trial courts may grant a motion for new trial based on legal insufficiency of the evidence. Citing, *Savage*, the court found that the trial court's judgment non obstante veredicto has the same effect as a trial court granting a new trial for legally insufficient evidence. Citing *State v. Evans*, 843 S.W.2d 576 (Tex.Crim.App. 1992), the Court found that courts look to the effect of a motion regardless of its title. Because the effect of the trial court's granting the judgment non obstante veredicto was the same as if it had granted a motion for new trial, the order is to be received as if the trial court had granted a new trial. On appeal, the appellate court must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

Another case further demonstrating the *Savage* principles is *State v. Bounhiza,* 294 S.W.3d 780 (Tex.App. - Austin 2009). In this case, the defendant was convicted for sexual assault. The defendant had filed an application for probation, desired the jury to decide his guilt or innocence but wanted the court to assess his punishment if found guilty. The jury convicted and the court released the jury. However, before the punishment hearing began, the parties realized that the trial court was statutorily prohibited from considering probation as a sentence. Defense counsel advised that he had incorrectly informed the defendant of the law and was ineffective in doing so. The trial court granted the defendant's motion for mistrial based on ineffective assistance of counsel. Citing *Savage,* the court found that the granting of the mistrial was the functional equivalent of granting a motion for new trial from which the State had the right to appeal.

Based on the above, trial judges have both the power to review the sufficiency of the evidence after verdicts and to actually enter post verdict judgments of acquittal if they find the evidence insufficient. *State v. Savage,* 933 S.W.2d 497 (Tex.Crim.App. 1994). In effect, that is what the trial judge did in this case. The trial judge reviewed the evidence and found it legally insufficient and by granting defendant's motion, the court was in effect entering a post-verdict judgment of acquittal. Such orders are the functional equivalents of orders granting motions for

7

new trial for legally insufficient evidence and this may be appealed by the State under the statutory authority to appeal from orders granting motions for new trial. *State v. Savage*, supra; 3 Tex.Prac.Guide Crim.Prac. & Procedures § 29.62.

The State is not entitled to mandamus the court. Rather, the State has the right to appeal the trial court's actions for the appellate court to review the evidence for a sufficiency determination.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** for all the reasons set forth herein, Real Party in Interest prays that the court deny Relator's Petition for Writ of Mandamus. Real Party in Interest further requests such other relief, both general or special, at law and equity, to which she may show herself justly entitled.

Respectfully submitted,

THE MOORE LAW FIRM, L.L.P.

BY:/s/ James R. Rodgers
James R. Rodgers
State License #17136300
Judy Hodgkiss
State License # 17136525
100 North Main Street
Paris, Texas 75460-4222
Telephone 903/784-4393
Facsimile 903/783-0042

ATTORNEYS FOR REAL
PARTY IN INTEREST

8

**CERTIFICATE OF SERVICE**

I certify that a true copy of the above document was delivered to all attorneys of record/parties, in accordance with the Texas Rules of Appellate Procedure this __ day of _____, 2015.

/s/ James R. Rodgers
James R. Rodgers

# APPENDIX A

REPORTER'S RECORD
CAUSE NO. 25545

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| | ) | |
| VS | ) | LAMAR COUNTY, TEXAS |
| | ) | |
| | ) | |
| | ) | |
| ERICA LYNN FULLER | ) | 6TH JUDICIAL DISTRICT |

EXCERPT OF
JURY TRIAL

On the 29th day of January, 2015, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Eric Clifford, Judge Presiding, held in Paris, Lamar County, Texas.

Proceedings reported by machine shorthand.

A P P E A R A N C E S

LAURIE POLLARD
SBOT NO. 00784774
JILL DRAKE
SBOT NO. 24015124
LAMAR COUNTY ATTORNEY'S OFFICE
119 NORTH MAIN
PARIS, TEXAS 75640
(903) 737-2458
(903) 737-2455 (FAX)
ATTORNEYS FOR STATE

                    -AND-

JAMES RODGERS
SBOT NO. 17136300
THE MOORE LAW FIRM, L.L.P.
100 NORTH MAIN STREET
PARIS, TEXAS 75460
(903) 669-1427
(903) 785-0312 (FAX)
ATTORNEY FOR DEFENDANT

I N D E X
EXCERPT
JURY TRIAL

Page

JANUARY 29, 2015

Proceedings............................. 4

Cross-Examination by Mr. Rodgers......... 4
Redirect Examination by Ms. Pollard...... 12
Recross-Examination by Mr. Rodgers....... 14

Court Reporter's Certificate............. 16

EXHIBIT INDEX

(No exhibits.)

PROCEEDINGS

CARYON MILLER,

having been first duly sworn, testified as follows:

CROSS-EXAMINATION

BY MR. RODGERS

Q. So we've been here for a day and a half and if -- you understand I've -- I've objected to saying I don't think you're qualified to do this audit; you understand that, right?

A. Yes, sir.

Q. And you don't have an accounting degree?

A. No.

Q. Not a certified auditor?

A. No.

Q. Not a CPA?

A. No, I'm not.

Q. You work for Diversicare, right?

A. Yes, sir.

Q. This isn't a law enforcement forensic accounting; you haven't turned this over to law enforcement to have them look at it, right?

A. Correct.

Q. In fact, what I just heard you tell Ms. Pollard is, y'all tried to explain that DADS, the Disability Aging -- they didn't find anything with

Mr. Hughes' account at all, did they?

A. No, sir.

Q. So the agency that oversees y'all comes in -- now you're trying to apologize and say, Well, maybe they came in at the wrong time or they did this. They didn't find anything amiss with Mr. Hughes' account, did they?

A. No, sir.

Q. The TEC, when this lady filed her unemployment claim, didn't find anything amiss in what she did, right?

A. I'm not aware of that.

Q. Well, let me ask you what you are aware of then. So we've been here for a day and a half and the long and short of it -- and I disagree with your audit, but if I were to agree with everything you said, what you have established is -- is that Brentwood got some money out of the trust fund and it went into the operation's account. Whose account did it go into?

A. The operation's account.

Q. Is that Erica Fuller's money?

A. No, sir.

Q. Who got that money?

A. The facility.

Q. Brentwood. You got the money, right?

A. The facility, yes, sir.

Q. So I've been saying it for a day and a half. There's no money going into her pocket. It went from one account to the other account and Brentwood is the one that has the money, right?

A. It was deposited into Brentwood's operating account.

MR. RODGERS: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. RODGERS) You know, you talk about there could be bookkeeping errors, we're all human and we can all do this. I was just looking at something. Y'all talked about that $775 on a May McFadden. I was just looking down while I was killing time, waiting to get up here and ask you a question or two, and you said Erica entered all of these transactions. What did she enter? You said $775 mistake on May McFadden. Look at what your own exhibit shows on November 5, what does it show that Erica entered?

A. Wrong account.

Q. How much?

A. $775.

Q. So that big production y'all went through about the $775 Erica comes back and puts "wrong account" took the 775 away, right?

A.    This is the November 5th transaction.

Q.    $775, right?

A.    Yes.

Q.    And to -- not to beat a dead horse, but, my gosh, that $775 was a check?

A.    Yes.

Q.    Who was the check made out to?  It's not made out to Erica Fuller, is it?

A.    No, sir.

Q.    Y'all stamped "for deposit only", right?

A.    Yes.

Q.    You're the auditor, right?

A.    Yes.

Q.    Did you find a single check that Erica Fuller ever took and -- or maybe made up a stamp "for deposit only" to Erica Fuller?

A.    No, sir.

Q.    Did you find anything like that?

A.    No.

Q.    But you're the auditor, right?

A.    Yes.

Q.    You can't find one penny that went in her account, can you, or name or anything else, right?

A.    I never reviewed her accounts, no.

Q.    She's charged with a crime and nobody checked

to see if she's the one that actually got the money, but you said a while ago Diversicare got the money, right?

A.   It went into the operation's account.

Q.   Of Diversicare?

A.   Yes.

Q.   Did y'all give it back to Mr. Hughes?

A.   Yes, sir.

Q.   So he hasn't lost anything either, has he?

MS. POLLARD:  Objection, Your Honor. That's not the point.  The point is when the money was transferred out it was taken out of his account without his permission because it's not legally possible to do that.

THE COURT:  Overruled.

Q.   (BY MR. RODGERS)  Took it out of his account and put it in their account, right?  Put it in Diversicare's account?

A.   Correct.

Q.   Not Erica Fuller's account.  So even if she was a horrible bookkeeper and made mistakes here the end result is Diversicare got the money, right?

A.   Yes, it was paid to Diversicare through the trust fund.

Q.   And you talk about this keying in and you can tell she's the one that did that 3447 to the degree it's

even relevant, all you can see is there was a transaction on July 16th and maybe there was another transaction of the 3447 on July the 16th, but you can't sit here and swear those are the same transactions, now can you?

A. It does follow the --

Q. It appears --

MS. POLLARD: Objection, Your Honor. Could he -- he asked her a question. Could she --

MR. RODGERS: And I'm asking her to answer it.

Q. (BY MR. RODGERS) Can you unequivocally swear to that?

A. There is not a dollar amount on --

Q. Can you swear to it, yes or no? It's not a hard question. Can you swear because that's what you're doing? Can you swear to it?

A. This is the transaction --

Q. Just yes or no.

THE COURT: Ma'am, ma'am, answer the question.

A. No.

Q. (BY MR. RODGERS) No. That goes for everything you're saying here. It's a speculation by an uncertified auditor who doesn't even have an accounting

degree, right?

MS. POLLARD: Objection, Your Honor, argumentative.

THE COURT: Overruled.

MR. RODGERS: I'll ask another question.

Q. (BY MR. RODGERS) Y'all can pay $600 an hour to bring lawyers in to fight somebody like this; can't you afford to at least bring a CPA if you're going to do an audit?

MS. POLLARD: Objection, Your Honor.

MS. DRAKE: That's attacking the witness, Your Honor.

MR. RODGERS: Yes, it is.

THE COURT: Overruled.

Q. (BY MR. RODGERS) It is attacking. Y'all are going to bring charges against somebody. You're going -- you don't even -- you know, that -- that transaction -- Mr. McFadden's check, do you know a certified auditor would say, Go get the check. Right? Let's see who got the money, right? If you're accusing somebody of theft you'd want to see that she forged something on there; did she somehow end up with it. That's what a certified auditor would do, right? You didn't do that, did you?

A. No, sir.

Q. How many transactions did Erica Fuller do in a year there at Diversicare?

A. I do not have a total count.

Q. Thousands? Thousands?

A. I would assume.

Q. You look at those performance appraisals and early on y'all were talking about -- because Ms. Pollard asked you about Ms. Vinters gave glowing reports to Erica Fuller, right?

A. Yes.

Q. Ms. Vinters was a well-respected administrator, right?

A. To my knowledge, yes.

Q. Is it unusual that after working with somebody for three or four years if you really like them -- you know, if you got an employee that you trust and you work with that you might like them?

A. Certainly.

Q. That's a good thing, isn't it?

A. Yes.

Q. Ms. Vinters says outstanding employee, right?

A. Yes.

Q. Are y'all attacking Ms. Vinters? She was your administrator. Is she just dead wrong? Doesn't know what she's doing?

MS. POLLARD: Objection, Your Honor. He's asking her to speculate on something. She --

THE COURT: Sustained.

MS. POLLARD: -- hasn't anybody --

THE COURT: Sustained.

MR. RODGERS: I pass the witness, Your Honor.

REDIRECT EXAMINATION

BY MS. POLLARD:

Q. Okay. One more time. How many years have you been doing this?

A. Since June of 1990.

Q. How many years is that?

A. Almost 25.

Q. Okay. One more time for the record, Mr. Rogers cross-examined you to the effect that Erica Fuller didn't take anything from Brentwood. The money was transferred from one to the other account. One more time, is there a deposit of $1,416.84 pictured in State's 3 anywhere in the books for either bank account for Brentwood?

A. No.

Q. Who is responsible for taking the money collected, cash or check, and depositing it?

A. Erica Fuller.

Q.    Is there anywhere in the bank records, the deposit slips, a sum of money $2,031 for Mr. Boswell in July?

A.    No.

Q.    And who would have been responsible for taking that deposit to the bank and depositing it?

A.    Erica Fuller.

Q.    October 4th, 2010.  Is there anywhere a deposit of $775 for McFadden in the bank account records?

A.    No.

Q.    For either side?

A.    No.

Q.    December 6th, State's Exhibit 14, is there anywhere in the bank records of the deposits for either side, either account, a deposit of $137.50 in cash?

A.    No.

Q.    The bookkeeping -- and who would've been responsible for taking that 137.50 to the bank and depositing it?

A.    Erica Fuller.

Q.    Who would've been responsible for taking McFadden's $775 check to the bank?

A.    Erica Fuller.

Q.    Now, so Brentwood never got that money that's

represented by those four deposits?

A. Correct.

Q. Whose money was used to pay Brentwood's operation's fund?

A. Mr. Hughes' account.

Q. And so, who is out the money --

A. Mr. Hughes.

Q. -- as of December 2010?

A. Mr. Hughes.

Q. And how much money is Mr. Hughes out?

A. Approximately $8,000.

Q. Now, did Brentwood pay him back?

A. Yes, they did.

Q. Okay.

MS. POLLARD: Pass the witness.

MR. RODGERS: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

RECROSS-EXAMINATION

BY MR. RODGERS:

Q. And on these transactions you, as an auditor to whatever level, it's just a remarkable, remarkable coincidence that the -- all of the receipts are given by the receptionist. The receptionist takes the cash or the check. She's the one that gives the receipt. And

it's just one unbelievable coincidence that on Ms. Lawler, in two separate transactions, she checks both cash and check? Just an unbelievable coincidence that the receptionist, who is the one that took the cash, who is the one that receipted it, who is the one that did it just by happenstance on Ms. Lawler, which is the basis of this whole thing just so happens both times she did the receipts, cash and check both, just a coincidence?

A.    I do not know.

        MR. RODGERS:    Pass the witness.

        (End of excerpt.)

THE STATE OF TEXAS)

COUNTY OF LAMAR)

I, Crystal Cannon, Deputy Court Reporter in and for the 6th District Court of Lamar County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this excerpt of the Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this excerpt of the Reporter's Record is $176.00 and was paid/will be paid by Mr. James Rodgers.

WITNESS MY OFFICIAL HAND this the 5th day of February, 2015.

/s/Crystal Cannon
CRYSTAL CANNON
Texas CSR No. 8743
Expiration Date: 12/31/16
2619 Village Drive
Sherman, Texas 75090
(903) 819-2155